Case number 22-2158 United States of America v. Antwaun Allen Arguments not to exceed 15 minutes per side Mr. Nelson, you may proceed for the appellant Good morning. May it please the court, I'm Paul Nelson on behalf of Antwaun Allen and I reserve four minutes for rebuttal Mr. Allen is requesting the court to vacate his sentence and remand this matter for resentencing He's a, I think, a pretty clearly a small time drug dealer He had one customer who made several small sales to and unfortunately, as far as the record indicates, that customer became a confidential informant for the police and continued to purchase from him in greater amounts apparently, we believe, at the request of the police and eventually purchased a pound of methamphetamine and that was when Mr. Allen was arrested and under the, based on the facts here that approximately somewhere 85-90% of the drugs for which he was held responsible were drugs that were purchased by the CI at the, basically at the behest of the police and so the two issues were raised at sentencing seeking a sentence below the guideline range One was based on the disparity in the purity of methamphetamine between the ice methamphetamine and just regular methamphetamine which is a 10 times disparity and also that based on sentencing manipulation and sentencing manipulation is an issue unfortunately that's been I think I've had concerns about that for quite some time that basically this is a situation that the court in the past has indicated has not been recognized by this court as a ground for a sentencing adjustment but it's something that, a factor that's not necessarily considered by the guidelines and under the case law, the guidelines and statutes that the sentencing court should be able to consider that as a ground for a sentencing That's not necessary here Your argument does not depend upon having an entrapment claim, right? It could just be resolved on procedural and substantive reasonableness, right? It can be but that's, we think that that's one ground for the procedural reasonableness here is that the court failed to consider the fact that 85 or 90% of the drugs for which he was held responsible were sold by him basically at the request of the police And how quickly escalating was that amount? My understanding from your briefing is that it was very small amounts at the beginning and then there was just this substantial leap in the last purchase Have you calculated what a percentage increase in amount or size of the sale was to go from what he had been doing? I think the highest was, there was a 60 something and 128 and then all of a sudden it was a pound? Well, yes, your honor, that according to what he was held responsible for in the PSR was four sales where he indicated that he sold approximately one ounce to his customer One ounce is, according to the guidelines, is 28.35 grams and then subsequently after she became a confidential informant her first sale was 68 grams, so it was almost two and a half, three times of an increase then 109 grams shortly thereafter and then finally a pound which ended up being, according to its analysis, was 442 grams So his prior sales to her, when apparently she was not working for the police totaled 113 grams and during the time that she was a confidential informant that she purchased 619 grams from him Would you like to address the significance of Thomas Matthews, the supplemental 28J case you cited to this court? Yes, your honor, and again that goes to a separate issue here in terms of the district court's reliance on the guidelines and the purity guidelines that's the disparity between methamphetamine and ice and again that apparently the methamphetamine that he sold was pretty high quality but as was argued in the district court and the cases from other areas are showing that these days methamphetamine is different now than it used to be in the olden days when it was being made by people in their basements and so on now methamphetamine is essentially something that the Mexican cartels and other more professional drug dealers are selling and so it's generally of a higher quality and under Thomas Matthews I think that it's quite similar here to the comments made by the district court here during the course of sentencing when there was a request for a variance based on this disparity and multiple times during the course of the sentencing the district court relied on the fact that Congress had determined that the amount of drugs, the amount of methamphetamine was a significant factor that Congress had decided that it's an important factor that has to be punished and it's interesting that when the court came to the point when it made its ruling on the request for a downward variance the court was very generous in its comments about Mr. Allen's personal characteristics and went through a whole list of them that showed that he is a small time dealer that he's been working, that he's got family responsibilities and so on all of those and then the court went to, made its statement that but Congress at some point decided that certain amounts needed to be sentenced accordingly and then certain amounts depending on the purity of the mixture needed to be sentenced accordingly because of the dangerousness of that and that was at page 22 of the sentencing transcript, page ID 175. She's just following, I mean Congress sets the guide, I mean Congress passes the statute I mean that's not, she's not saying I don't think my hands are tied that you're making a policy argument and I don't see much of a similarity honestly with Thomas Matthews, I mean obviously I disagreed in that case too but in this case she says specifically I'm going through the list of what you're arguing in your request for a variance and she talks about it, she's clearly considering all of the arguments I'm not sure I understand what it was that she did wrong. Well I think that her reliance, and again it's perhaps not quite as obvious as it was in Thomas Matthews where the district court specifically said that it's up to Congress to make these policy decisions but the court did discuss this as a policy issue and a possible policy disagreement during the course of sentencing. Isn't that the nature of the argument? That it's a policy disagreement based on new evidence so to speak? And so how does one reject that argument other than to say I hear you but you know I think I'm going to stay with the guidelines. Well I think it was more than I hear you and I'm going to stay with the guidelines her response was Congress says that these type of sentences, Congress says that these certain amounts and certain purities have to be sentenced accordingly and that's why I'm going to deny your request for a downward variance. But didn't she also say that you know I recognize you're not a kingpin but for however long you've been doing this you are contributing to the issues, the concerns, the crime the potential overdoses that are out there in your community. And at some point she also said that he went in, I forgot the expression she used something like hitting it out of the ballpark or something but I'm not sure if you're referring on page 12 of the transcript, page ID 165 when there was talk about this and there was a suggestion or concern that Mr. Allen may be considered to be a drug kingpin in spite of the fact that he had very limited experience here and the court said but at some point Congress determined those amounts whether you want to call it kingpin or whatever those are large amounts that have to be, that need to have accountability as a result of large amounts to obviously deter other purposes of sentencing so it's not just a matter of calling him a kingpin or not. That the court relied on that and again I think that's another situation where whether it's he's a kingpin, whether he's a not, looking at this amount looking at this purity, Congress says he has to get this kind of a sentence. But that's, isn't that, the drug, the guidelines are driven by the amount of drugs, right? Correct. So what am I supposed to say if I'm the district judge? Presumably culpability goes into the calculation, right? Congress decided that if you sell a pound, you're more culpable than selling half a pound. I mean, isn't that correct? So if I just say that at sentencing, what am I saying that's wrong? I just, I don't understand what the error was. Well, I think that that's where the reliance is stressed on the congressional statement and the policy rather than indicating that for some other reason, that if they say that I think I can, that it is a policy decision, the court agreed to that, never said that there was a disagreement with that other than to say Congress says this is what the sentence should be. And that's the sentence I'm going to impose notwithstanding all of these other positive factors that would show that you're different from normal people and that you should get otherwise would get a variance. So you're saying a district judge has to grant a variance in any case where there's a policy argument? Or why can't the district judge say, hey, no, Congress said this and this is what I'm doing? I mean, I don't see any reason, she went through, I don't understand what she was supposed to do. She went through the factors, she went through the sentencing memo, which honestly didn't lay out this sentencing manipulation argument at all, but she goes through what was in the sentencing memo. I'm just confused about what else it was she was supposed to say. Well, I think in looking at Thomas Matthews that the, it's a question of, perhaps a question of degree, but there, and we think here that what the judge did is cede its discretion to Congress and rather than exercise its discretion on its own, the court simply relied on. But don't you agree that the sentencing memo in Thomas Matthews was much more clear about the policy arguments and the arguments than the sentencing memo was here? I mean, as I recall, the sentencing memo in Thomas Matthews laid out these policy arguments, laid them out pretty clear. It was clear to the district judge going in, and then obviously the defendant didn't mention them at all, which was the problem in that case or not the problem. Here, I don't think the sentencing memo is clear about any of this. Well, perhaps not, but at least during the course of sentencing, I think it was fully fleshed out in the fact that there was a policy decision based on, again. But she asked directly the question, so this is a policy argument, right? And the response was, well, it's kind of a policy argument at sentencing. So you weren't even clear at the sentencing that they were saying this is definitely a policy argument. I mean, we are asking you to disagree with the policy, right? Well, I think the court understood, based on my reading of the transcript, I think the court understood it to be a policy decision and the court, based on, again, based on what Congress has said, the court agreed that there was no reason to vary from that and that was giving up the court's discretion to exercise a variance. I think you're a little bit over time now. You'll have all your rebuttal time. Thank you. No, that's okay. Are you finished? I'm done. Thank you. Good morning, Your Honors, and may it please the court. I'm Catherine Dalzell on behalf of the United States. I want to first say that I agree with the court that this court does not need to address the sentencing manipulation and entrapment arguments, and indeed I think the court should not address those because they were not raised for the first time until the reply brief on appeal. So I just do not think those were preserved. Well, it certainly became clearer, but to me it's a matter of labels because he was clearly arguing at sentence that the court should consider the fact that these amounts which were driving the sentence were created by the government, that there's no other history of selling in any quantities, and in fact this was his only customer. And at sentence the prosecutor sort of implied, well, you must have been doing this a long time. I mean, there was no weapons for that, and the judge knew that. So I'm more concerned with whether, you know, he made sort of a holistic argument. He said, look, this is somebody who has no history of involvement, was selling small quantities to one customer, and then the government came in and escalated the whole situation. And he didn't even know how pure it was. So, you know, as a combo, that's a judge you should bury downward. And I don't know that the judge gave any response other than, I hear you, but this is what Congress said. So I agree with you that the labels, it's a matter of labeling, but I think the labels are important because what he argued at sentencing, he certainly did argue that these amounts were driven by the government. So he certainly preserved that. The court addressed that argument in that, I mean, his argument essentially boiled down to saying, I was not dealing in these quantities until the confidential informant got to me. And the court addressed repeatedly his argument that this was an aberration for him, that he was not a large-scale dealer, and that he wasn't selling drugs for very long. And the court even said, even assuming that you were selling drugs for a short time, I mean, I think she explicitly credited that defense argument. She said he was certainly contributing to crime and potential overdoses with what he was doing. And the court said, you know, I take the defense argument that you were acting out of character and that this may have been the first time for you dealing drugs. But she said, you certainly hit it out of the park in going to the extreme with the seriousness of your offense. So the argument he made was essentially that this was an aberration. And yes, he said the government drove this amount, but it's clear from the district court's decision that that was not relevant to her. What she was more concerned with was the huge quantity, and I will get to that, the fact that the confidential informant asked him for that quantity. But sticking with what the judge said for the moment, she was very concerned about that quantity. She said it's dangerous. This is a judge that has been in law enforcement for over 25 years as a state and federal prosecutor and a state and federal judge. And she did not say this, but it's important to know and someone in her position would know. I mean, a pound of meth is anywhere between 2,000 and 4,500 single doses. But isn't that part of the problem with the government being involved in entrapment? It's just really concerning to me. It makes me want to say, is there not enough real crime out there that you folks have to go after people who are not involved in it? I mean, this is the outcome of that kind of activity. And to me, it doesn't behoove the justice system to be involved in that. So I had, Your Honor, the same question as someone who does appeals and does not regularly deal with investigators. And what I want to say about that is there are a lot of reasons why investigators and law enforcement would request large amounts of drugs. Those are... Obviously one of them. Well, besides sentencing manipulation is what I want to say. First, they might want to confirm information that they've received from a confidential informant. You know, someone might be in prison telling the government, you know, this guy can get us a large amount of drugs. The government wants to confirm that. They don't want to just take the informant's word. They want to determine the capacity of the target that they're investigating. They want to see how big of a fish the person is. It can help identify sources of supply because if it's a large quantity, you know, either the person has it on hand, which of course indicates that it's a big fish, or they might call a larger source of supply, in which case the government might be... But if you arrest the guy, then you can ask him about his supplier yourself, whether he has given you a large amount or a small amount. I just struggle with this method and struggle with it particularly because of the very example that you have here. It seems very much to me like the stash house, the fake stash house robberies in which people are drawn in to an illegality. I find that, counsel, I find that exceedingly troublesome. The fake stash house cases have been widely criticized. Rightly so. But I want to say I think this is very different from the fake stash house cases because in those cases it was essentially just a made-up crime. There was no indication that those people were embarking on a criminal adventure. They were vulnerable people who were just getting out of prison and for all we know might have been trying to reintegrate into society and lead law-abiding lives. Other things to consider that I believe this court mentioned, in the fake stash house cases, of course, you can only do one hit, like one robbery. So the incentive was to make the quantities of drugs sought very large. And make sure everyone came armed. And the government made it look easy to get an outsized reward. The government did all of the work and strategy. So that's a very different scenario than what we have here, which is someone involved in drug trafficking. And so this is not a case where the government is just manufacturing a crime. The government has received information that this person is selling large quantities of drugs. And so they send someone in to confirm it. They do controlled buys and they test the person's capacity. They can see if, you know, they say we want a pound and the person supplies the pound. Is he supplying it quickly? Does he have it on hand? Is he calling someone else? Where is he going? You know, like in this case, he went to, I think, two different houses. It says in the PSR where he went to pick up the drugs. So that way the government knows where he's getting it. And the government always incrementally increases the amount. You know, you can't just go to someone and say, I want a pound of meth, because that would set off alarm bells. So it's not unusual for a confidential informant to start out by requesting smaller amounts and then escalate it. I think it's important to note, too, that in this case, the government did not charge the mandatory minimum. Which I think is a very strong indication that the government was not trying to manipulate Mr. Allen's sentence. The government had received information. They were trying to confirm it. They were figuring out where he was getting this, how big of a fish he was, and then we have what happened here. So I think there are a lot of reasons why the government might request that quantity besides sentencing manipulation. I find it concerning. I appreciate the offer of background information that's helpful. Can you talk about the remainder of the sentencing issues here? Yes. I assume the court is referring to the Thomas Matthews issue. Is that where you would like me to go next? Yes. Okay. This case is very different from Thomas Matthews. I think in both Thomas Matthews and in Johnson, the case that Thomas Matthews referred to, the big problem there was that the courts made comments to the effect of the legislative branch is the proper way to make these decisions about scoring, drug scoring. It's not the court's role. It's not the Department of Justice's role to say we have this position regarding, for example, crack and powder. So, you know, in Thomas Matthews, the court said the proper way to deal with this issue is by Congress. And in Johnson, the court said the legislative branch is the correct forum for this policy judgment and that courts are ill-equipped to make this decision. The court here said nothing like that. The court did refer to Congress, but if you look at the references that the court made to Congress here, it was the court asking defense counsel why Congress was wrong, which actually shows, A, that the court understood it could vary, and, B, the court was engaging in the merits of Congress's policy decision. The court, you know, repeatedly asked, why are these amounts wrong? You know, why do these congressional decisions about purity not matter anymore? And I think the best way to read the transcript is that the judge was simply unpersuaded by the defense response. And the court said... So on that defense response on about the change in the purity, the court was clearly caught on the 100% purity, and yet wasn't a great deal of information available in the briefing about the fact that that is what the purity is on the street now. And as a result of that, we have a whole class of people who are being, you could say, over-sentenced, or the considerations against them are being treated as if they are the historical, unusual nature, when in fact they are the very essence of what the street drug is now. Is there not a problem with the failure to recognize that change in what's on the street? I don't think the court failed to recognize the change. I think that the court clearly heard, and there were direct exchanges during the sentencing transcript that show the court heard that argument and considered it. I think that the court had independent concerns, regardless of the guidelines, about that purity level. And I think an important point to recognize is it's certainly true that the methamphetamine on the market today is of a higher average purity than it used to be. But it makes it more dangerous. If meth is 100% pure, 99% pure, that's going to be a bigger problem, more potential for overdose than meth that is 40, 50, 60% pure. Then does the sentence just bend on the happenstance of whether the guy who had a whole lot over here happened to buy 80% pure and the person over here who for the first time sells a pound gets the 100% pure? Doesn't that create that same categorical problem in upping the ante for the whole category of the people who are sentenced based on purity? So I think when you're selling drugs, you're taking on a risk about what it is that you're providing. That is the danger of buying street drugs. You don't know if it's 100% pure, you don't know if it's 40%, you just don't know. And when you get 100% pure meth and you take a certain amount, you might die because you are overdosing on it and you might not even know. So these drug dealers, and a lot of them know when the meth is high or purity because they can charge more. It didn't seem to be the case here, right? It's not in the record whether that was the case here or not. But that is to say, it is dangerous. The district court was correct in saying that this purity is dangerous. And the district court, who again has over 25 years of experience in law enforcement, this was her first time seeing 100% purity. I mean, that's still relevant. Even if the average purity is higher, it's still very rare to see 100% purity. That means the meth is uncut. You're probably closer to a larger source of supply. The court also expressed independent concerns about quantity, regardless of the meth guidelines. You know, the court said it's a sad state of affairs that today one pound is not considered kingpin or that arguments could be made that it's not considered kingpin. It's just clear that the court heard the argument. It understood the argument. It just was nonetheless concerned about someone who is out there selling a pound of methamphetamine at either a 99% or 100% purity. And it said repeatedly, the court understood its authority to vary, certainly. It said the guidelines are advisory and a starting point only. The guidelines are only one factor. I have other factors to consider. The court said, I'm looking at the arguments you've made for a downward variance, showing that it understood it could do a downward variance. I have to weigh all the factors, not just one. I do an individual. How much of it was 100% pure? I believe that it was the sale from March 29th. It was 4.4, well, 109 grams. That was 100% pure. And again, the information out there is that an average meth dose, a single dose, is about anywhere between 5 doses and 10 doses per gram. So that, even though it's a lesser amount than the pound, that was still like 500 to 1,000 individual doses. And then the pound, the PSR said, was 99% pure, which is still, of course, an extremely high purity. So this is someone who, you know. I mean, I wonder if the judge was current on her knowledge. I mean, I only see it on appeal, and I've had many cases that were 100% pure. I mean, all I can say is 25 years of experience, this happens to be her first time seeing 100% pure. But regardless, her considerations remain valid, is that that makes it more dangerous. And she said specifically, that makes it all the more dangerous. So she had concerns that were independent of the guidelines ratio. And they make sense. This is a person who's dealing in quantities that supply somewhere between 2,000 and 4,500 individual doses of meth, depending on what you think the average dose is. You're a little over time. Why don't you take a moment to finalize your argument? Okay. I believe that about does finalize my argument, unless the court has further questions. No, thank you. Thank you. I appreciate your time. Thank you. Judge White, I'm not sure if I understood your comment. But if I did, I think the issue of sentencing entrapment versus sentencing manipulation, I mean, I've had a difficult time sort of wrestling with that. I'm not sure if it's anything more than just a question of semantics. I mean, basically it comes down to the same thing, that a defendant is held responsible based on, essentially by the police, what they did and how they did it. And, again, to the extent that the district court said that Mr. Allen hit it out of the park this time, I think that he may have hit it out of the park, but it was the government that threw him a pitch to do it with the sense that he should do that. And I think part of this, when I first became involved in the Federal Defender's Office quite a long time ago, an issue in the state was this 650 lifer law that people were talking about. And I think that what happened here was something that was pretty common in that time, was to basically bait people with small amounts and small amounts and increase them a little bit and increase them a little bit and then hit them with a big sale where they could end up sending them to prison for life. And, again, I think it is a situation that, to a certain extent, and it may not be the offense, would not have been committed but for the police involvement, but certainly the amount of drugs involved would not have been the same but for the involvement of the police. But you admit that that argument wasn't made below, right? I mean, there is an argument about the amount and that he's not a kingpin, but there's no drawn-out argument about how this is a manipulation, entrapment. None of the cases that you cite on appeal were cited in the sentencing memo on this issue, right? That's correct. Although at sentencing, Your Honor, and turning to page 17 of the sentencing transcript during elocution, the government was talking about this and talking about the purity and the amount and at the bottom of the page, and the other thing that suggests it is that while Ms. Kluwet correctly points out that he has no criminal record, someone doesn't wake up one morning and sell a pound of methamphetamine. Someone doesn't wake up one morning and have access even to a pound of methamphetamine. To be able to obtain and sell that amount is indicative of someone who has been doing this for some time, giving his criminal record, and we know he's been getting away with it. And in response to that, at the end of the sentencing, when the judge asked the Bostick question and asked if there were any issues, at that point, defense counsel specifically said that this was driven by the government's request for the drugs. And that was the point, at that point, the district court did not respond to that. The district court could have addressed it. I guess I'm confused. I go to the sentencing memo and it says this is a large amount of drugs driven by the government. He's not a kingpin. So the argument is he's not a kingpin because he sells small quantities and the only time he's ever sold a large quantity is when the government asked for it. And so the judge says, I agree, he's not a kingpin. There's no articulation of any other argument in my mind. There's no case sites, there's nothing in here that suggests that you're making a different argument in response to the Bostick question than the argument that was made in the sentencing memo. Is there? Well, even if it was the same argument, I think the argument made in the sentencing memo in that response addresses this particular issue. And one thing, if I could just one further comment, that in the Flowers case, when the court, although it was unpublished, the court noted that sentencing manipulation, sentencing entrapment had not been recognized and we decline to resolve that question and leave it for another day. I think there are two things that could come of this. One, that ultimately we would ask the court to vacate the sentence and remand for resentencing to keep that, for that to be applied here but also just to note that that is a legitimate ground for consideration for the district court in sentencing someone. That's a policy argument? Pardon? Is that a policy argument? Is this manipulation, is this essentially a policy argument that the district court would say I can vary downward on this ground because of the sentencing manipulation entrapment, whatever it is? I think that's one way the court could look at it. And also under the guidelines, as far as a potential departure that it's circumstances that are not taken into consideration by the guidelines. So I think either one, that ultimately the court could reduce the sentence. Thank you. We thank you both. Good briefing, good information and good argument. The case will be taken under advisement and an opinion rendered in due course. You may call the next case.